UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Violations: |
| v. ) | |
| ) | 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) |
| HUWIDA FADL ) | |
| Defendant. ) | |

## STATEMENT OF THE OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States and the defendant HUWIDA FADL agree and stipulate that at all relevant times:

### Relevant Individuals and Entities

1. During at least the period from January 2014 through October 2014, Defendant HUWIDA FADL, a resident of Virginia, worked at the Kuwait Health Office located in Washington, D.C. ("Kuwait Health Office").

2. During at least the period from January 2014 through October 2014, Defendant WAEL MOHAMED SEDIK, a resident of Virginia, also worked at the Kuwait Health Office located in Washington, D.C.

3. During at least the period from June 2014 through October 2014, Defendant WALID ALY, a resident of Virginia, also worked at the Kuwait Health Office located in Washington, DC.

4. The State of Kuwait has a state-funded healthcare system, which provided certain approved medical treatment without charge to Kuwaiti nationals. Kuwaiti citizens seeking specialty healthcare not available in local hospitals could request to be treated abroad.

5. The Kuwait Health Office was a mission office of the Kuwait Ministry of Health, which coordinates and pays for approved healthcare costs for Kuwaiti nationals obtaining treatment in the United States. The Kuwait Health Office's core responsibilities were to coordinate care provided by medical service providers, to arrange for medical care providers to be paid with Kuwaiti government funds for services, and to pay patients and their families a bi-weekly stipend for travel and living expenses.

6. The Kuwait Health Office maintained a Bank of America account in Washington, D.C. The account was funded each month by wire transfers originating from the Kuwaiti government. Medical care providers that treated Kuwaiti nationals billed the Kuwait Health Office directly and the Kuwait Health Office remitted payment from the Bank of America account.

7. Bank of America is insured by the Federal Deposit Insurance Corporation.

### Introduction

8. In or around January 2014 through September 2014, co-conspirators, including certain employees in the Kuwait Health Office and non-employees, conspired to steal funds from the Kuwait Health Office by obtaining payment for medical services that were not rendered. FADL joined that conspiracy. To carry out this theft scheme, FADL and others conspired with friends, family members, and other employees to incorporate shell companies, open bank accounts in the names of the shell companies, create false invoices, deposit cash and checks, withdraw cash and issue checks, and disburse funds to co-conspirators.

9. In the course of carrying out the theft, FADL knowingly and intentionally conspired to conduct and conducted financial transactions, including deposits and withdrawals of fraudulently obtained funds using of multiple bank accounts that the co-conspirators controlled which were opened in the names of shell entities, at financial institutions engaged in, and the activities of which affect, interstate and foreign commerce.

10. In the course of carrying out the theft, FADL knowing and intentionally conspired to conduct and conducted such financial transactions knowing that the money involved was the proceeds of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds.

11. The money stolen from the Kuwait Health Office and funds received by FADL were, in fact, the proceeds of specified unlawful activity, to wit, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and bank fraud in violation of 18 U.S.C. § 1344.

**The Theft Scheme**

12. In or around January 2014, a Kuwait Health Office employee, WAEL MOHAMED SEDIK agreed with others to steal funds from the Kuwait Health Office. To carry out the theft, SEDIK agreed to recruit others to incorporate a series of shell companies and to open bank accounts in the names of those shell companies. SEDIK and his co-conspirators agreed that shell companies would be incorporated with names that sounded similar to legitimate health care providers, in order to make them appear like actual medical providers of legitimate services to try to avoid detection of the scheme. The operators of the shell companies and others involved in the scheme would then submit invoices in the names of the shell companies to the

Kuwait Health Office for medical services that were not rendered and would receive payment for those services. In addition, SEDIK agreed with others that the stolen funds would be shared with other individuals, including those who incorporated or operated the shell companies (the "shell company operators") and opened bank accounts in the names of those shell companies.

13.     From in or around January 2014 through September 2014, SEDIK and others recruited at least five co-conspirators to incorporate or operate shell companies in Virginia and Maryland. The shell companies incorporated in Virginia included UPMC GLOBAL CARE LLC and HOPIKEN MEDICAL SERVICE INT LLC. The shell companies incorporated in Maryland included HOPIKEN MEDICAL SERVICE LLC, MED STAR PHYSICIAN LLC, and UPMC GLOBAL SERVICES LLC (collectively, the "shell companies").

14.     In or around January 2014, FADL recruited her family member, UCC-1, to assist SEDIK. UCC-1 assisted SEDIK by operating a shell company, which was used in the conspiracy.

15.     During this time period, SEDIK also instructed the shell company operators to open bank accounts that corresponded with the companies. These bank accounts were used by co-conspirators to deposit checks issued by the Kuwait Health Office and to issue checks and withdraw funds to pay the co-conspirators.

16.     On or about January 22, 2014, FADL's family member, UCC-1, opened an account at Bank of America in the name of "DBA MedStar Health & Transportaion Servi" ("UCC-1's SHELL COMPANY").

17.     In order to steal funds from the Kuwait Health Office, SEDIK directed the shell company operators to create fake invoices and submit them to the Kuwait Health Office for payment.

18. FADL coordinated the delivery of fake invoices and checks between SEDIK and the shell company operators, calling the co-conspirators in order to make arrangements for them to pick up checks, deposit checks, or issue new invoices from the shell company to the Kuwait Health Office.

19. After receiving the invoices, SEDIK would submit the false invoices for payment despite knowing that the shell companies did not provide any actual services to the Kuwait Health Office. For example, the following checks were issued by the Kuwait Health Office to the shell company created by UCC-1, FADL's relative:

| Date (On or About) | Account Holder | Amount |
|---|---|---|
| 4/4/14 | UCC-1's SHELL COMPANY | $6,162.52 |
| 4/4/14 | UCC-1's SHELL COMPANY | $5,596.15 |
| 4/4/14 | UCC-1's SHELL COMPANY | $6,860.62 |
| 5/5/14 | UCC-1's SHELL COMPANY | $48,187.50 |
| 5/5/14 | UCC-1's SHELL COMPANY | $42,187.50 |
| 5/5/14 | UCC-1's SHELL COMPANY | $38,187.50 |
| 5/5/14 | UCC-1's SHELL COMPANY | $41,687.50 |
| 6/30/14 | UCC-1's SHELL COMPANY | $32,341.90 |
| 6/30/14 | UCC-1's SHELL COMPANY | $25,222.60 |
| 6/30/14 | UCC-1's SHELL COMPANY | $38,000.00 |
| | TOTAL | $284,433.79 |

20. After the checks from the Kuwait Health Office to the shell companies were issued, the majority of the checks were mailed to addresses associated with the shell companies and the shell company operators.

21. After receiving the checks, the shell company operators, or individuals associated with them, deposited the checks into the shell companies' bank accounts. FADL assisted the co-conspirators by depositing checks issued by the Kuwait Health Office into the shell companies' bank accounts. For example, on at least two occasions, FADL collected checks that had been mailed from the Kuwait Health Office to UCC-1's P.O. Box.

22.     After collecting the checks from UCC-1's P.O. Box, FADL deposited checks issued by the Kuwait Health Office to UCC-1's SHELL COMPANY. FADL deposited at least the following checks into UCC-1's SHELL COMPANY's Bank of America account:

| Date (On or About) | Amount | Recipient | Recipient Bank |
|---|---|---|---|
| 5/5/14 | $38,187.50 | UCC-1's SHELL COMPANY | Bank of America |
| 6/30/14 | $38,000.00 | UCC-1's SHELL COMPANY | Bank of America |

23.     Once the Health Office checks were deposited into the shell companies' accounts, funds were transferred to the co-conspirators in the form of cash or checks. FADL assisted the co-conspirators by cashing checks issued from the shell companies' bank accounts so that funds could be distributed to the co-conspirators. For example, FADL deposited the following checks issued from the shell companies' accounts:

| Date (On or About) | Account Holder | Originating Bank | Amount | Recipient |
|---|---|---|---|---|
| 2/6/14 | UCC-1's SHELL COMPANY | Bank of America | $2,000.00 | FADL |
| 4/8/14 | UCC-1's SHELL COMPANY | Bank of America | $2,400.00 | FADL |
| 5/16/14 | UCC-1's SHELL COMPANY | Bank of America | $8,000.00 | FADL |
| 6/3/14 | UCC-1's SHELL COMPANY | Bank of America | $6,150.00 | FADL |
| 6/3/14 | UCC-1's SHELL COMPANY | Bank of America | $4,000.00 | FADL |
| 7/1/14 | UCC-1's SHELL COMPANY | Bank of America | $7,000.00 | FADL |
| 8/20/14 | HOPIKEN MEDICAL SERVICE INT | Wells Fargo | $3,000.00 | FADL |
| 8/25/14 | HOPIKEN MEDICAL SERVICE INT | Wells Fargo | $3,000.00 | FADL |
| | | | TOTAL | $35,550.00 |

24.     After depositing the checks issued by the shell companies, FADL would withdraw a portion of their value in cash to distribute to other co-conspirators.

25.     As compensation for her role in the conspiracy, FADL received all or a portion of the cash obtained from depositing checks issued by the shell companies, which totaled $35,550.00. FADL received payments from SEDIK that, according to FADL, amounted to approximately $13,000, and payments from UCC-1 that amounted to more than $5,000.

6

26. FADL also furthered the conspiracy by transferring funds from accounts held by UCC-1 and UCC-1's SHELL COMPANY. In or around July 2014, UCC-1's SHELL COMPANY's account was closed by Bank of America. FADL collected a check for $25,228.24, which represented the remaining value in the Bank of America account, and deposited it into a new joint account that FADL and UCC-1 opened at BB&T Bank. FADL deposited these funds knowing that the funds had been obtained illegally.

27. From in or around January 2014 until September 2014, more than $1.5 million in checks were issued by the Kuwait Health Office to the shell companies.

28. By at least May 2014, FADL strongly suspected, and by at least July 2014, FADL affirmatively knew, that the funds obtained from the shell companies in both cash and check form were illegally stolen from the Kuwait Health Office and that the money she had received was proceeds of illegal activity.

\* \* \* \* \*

This statement of the offense is not intended to constitute a complete recitation of all facts known by FADL, but is, instead, intended to provide a sufficient legal basis for her guilty plea to the charges against her. However, FADL admits that the facts known to her that are contained herein are true and accurate. To the extent that certain facts contained herein are outside of her direct knowledge, she believes them to be true and accurate.

Respectfully submitted,

M. KENDALL DAY, CHIEF
ASSET FORFEITURE AND MONEY
    LAUNDERING SECTION

By: /s/ Stephen Gibbons
STEPHEN A. GIBBONS (D.C. BAR 493719)
Trial Attorney
MARIE DALTON (CA. BAR 246606)
Trial Attorney
Asset Forfeiture and Money
    Laundering Section
United States Department of Justice
1400 New York Avenue, NW
Bond Building, Suite 10100
Washington, DC  20005
Telephone:    (202) 598-2523
              (202) 598-2982
Email:        stephen.gibbons@usdoj.gov
              marie.dalton@usdoj.gov

## Defendant's Acceptance

I have read or have had read to me the 8 pages which constitute the government's Statement of Offense and have had the opportunity to discuss it with my attorney. I fully understand this statement and agree that it is true without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in my plea agreement.

I am satisfied with the legal services provided by my attorney in connection with this proffer and my plea agreement and matters related to it.

Date: 12/19/16

Huwida Fadl
Defendant

## Attorney's Acknowledgement

I have read each of the 8 pages which constitute the government's Statement of Offense, had the opportunity to fully review and discuss them with my client. These pages accurately set forth the government's evidence as I understand it.

Date: 12-19-16

Atiq Ahmed, Esq.
Attorney for Huwida Fadl