# **EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

MAR - 4 2019

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES OF AMERICA )
)
Plaintiff, )
) Crm. No. 16-211-001 (RBW)
v. )
) **UNDER SEAL**
HUWIDA OSMAN FADLELMAWI, )
aka "HUWIDA FADL," )
)
Defendant. )
)

## GOVERNMENT'S SENTENCING POSITION ▮

Plaintiff United States of America, through its counsel of record, the Money Laundering and Asset Recovery Section, Criminal Division, United States Department of Justice (the "government") submits its Sentencing Position for defendant Huwida Fadl ("Defendant") ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The government submits that the Court should adopt the factual findings, Guidelines calculations, and criminal history determination made by the United States Probation Office ("Probation") in Defendant's presentence investigation report ("PSR"). However, the government submits that Defendant deserves an additional 1 level adjustment to the advisory Guidelines range of 33 to 41 months imprisonment that Probation calculated in her PSR to credit Defendant for accepting reasonability by timely notifying the government of her intent to plead guilty. *See* USSG § 3E1.1(b). Granting Defendant this additional 1 level adjustment would reduce her advisory Guidelines range to 30 to 37 months imprisonment.

███████████████████████████████████
███████████████████████████████████
████████████████████
████████████████. The government recommends that the Court sentence Defendant to 33 months imprisonment and a three-year term of supervised release, order a special assessment of $100, and order Defendant to pay $1,381,016.05 in restitution to the State of Kuwait, the victim of her offense.

## I. INTRODUCTION

In January 2014, Defendant, a data entry specialist in the Kuwait Embassy Health Office in Washington, D.C. ("Health Office"), joined a scheme to embezzle money from the Health Office. (PSR ¶¶ 13-25, 74.) Defendant learned that the Health Office's Financial Attaché, Hanan Al-Sharaf ("Al-Sharaf"), a Kuwait diplomat who was responsible for the Health Office's finances, and one of her subordinates, Wael Sedik ("Sedik"), an account in the Health Office, wanted individuals who were willing to incorporate shell companies in Virginia and Maryland and invoice the Health Office for medical services that the shell companies did not provide. On paper, these individuals would appear as the owners of the shell companies, but in reality, they would take direction from Al-Sharaf and Sedik. In exchange for incorporating the shell companies and acting as their nominee owners, Al-Sharf and Sedik allowed the nominees to keep fifty percent of proceeds that they embezzled through their shell companies while Al-Sharaf and Sedik split the remainder of the proceeds equally.

Defendant wanted to participate in this scheme, and referred Sedik to her brother, Hussain Fadl Osman ("Osman"), who agreed to act as a nominee owner and incorporate a shell company. (*Id.* ¶¶ 28, 20, 28.) Al-Sharaf did want to draw the Health Office's attention to the

shell companies, and, therefore, she directed Sedik to instruct Osman and the other nominees (collectively the "Nominees") to name their companies to resemble legitimate U.S. healthcare providers with established relationships with the Health Office, such as John Hopkins Hospital, MedStar Georgetown University Hospital, and the University of Pittsburgh Medical Center. (*Id.* ¶¶ 15-16.) Osman complied and incorporated a shell company in Maryland named "Med Star Physician LLC" ("Med Star"). Osman also opened an account at Bank of America in the name of "DBA MedStar Health & Transportation Service." (*Id.* ¶¶ 16, 20.) The other Nominees who joined the scheme incorporated shell companies in Virginia and Maryland named "Hopiken Medical Service Int LLC," "Hopiken Medical Service LLC," "UPMC Global Services LLC," and "UPMC Global Care LLC." (*Id.* ¶ 16.)

With Sedik's assistance, the Nominees created fraudulent invoices from the shell companies and mailed them to the Health Office. (*Id.* ¶¶ 17, 28.) When the invoices reached the Health Office, Sedik, who Al-Sharaf made responsible for paying invoices submitted by Virginia and Maryland healthcare providers, drafted checks off the Health Office's bank account to the shell companies and forward them to Al-Sharaf, who approved the checks for payment. (*Id.* ¶¶ 18-19.) The Health Office then mailed the checks to the shell companies at addresses that often matched the Nominees' home addresses. (*Id.*)

Defendant and her co-conspirators perpetrated this scheme from January 2014 to September 2014. (*Id.* ¶¶ 13-14, 25, 30.) During this time period, Defendant played an important role in the scheme's success, helping Osman and their co-conspirators launder approximately $1,318,016.05 of the over $1.5 million in checks that Defendant and her co-conspirators duped the Health Office into writing to the shell companies. (*Id.* ¶¶ 25, 30.) On approximately eight occasions, Defendant deposited checks totaling $35,500 from Med Star and Hopiken Medical

3

Service Int LLC into her personal bank account. (PSR ¶¶ 20-21, 28; Docket Number ("Dkt.") 7 (Statement of the Offense) ¶ 23.) Defendant then withdrew some of this money in cash and distributed it to her co-conspirators. (PSR ¶¶ 20-21, 28; Dkt. 7 ¶¶ 23-24.)

Defendant also helped Osman launder over $284,000 that the Health Office paid to Med Star. (PSR ¶ 21.) On at least two occasions, Defendant retrieved two Health Office checks from Med Star's PO Box and deposited them into Med Star's Bank of America account. (*Id.* ¶¶ 21, 28.) In July 2014, Bank of America closed Med Star's account due to suspicious activity, prompting Defendant to withdraw approximately $25,288 in embezzled proceeds that remained in the account and deposit the money into a BB&T Bank account that she owned with Osman. (*Id.* ¶¶ 24, 28.)

Besides helping Osman and the other Nominees launder the embezzlement proceeds, Defendant also acted as an intermediary between Sedik and the Nominees. Defendant called the Nominees and arranged for them to retrieve or deposit checks from the Health Office, and told the Nominees when it was time for them to submit new fraudulent invoices to the Health Office. (PSR ¶¶ 20-21, 28; Dkt. 7 ¶ 18.) Sedik compensated Defendant for her criminal conduct by allowing Defendant to keep all or some of the embezzlement proceeds from the shell company checks that she deposited into her personal bank account. (PSR ¶ 23; Dkt. 7 ¶ 25.)

## II. GUIDELINES CALCULATION

In Defendant's PSR, Probation made the following Guidelines calculations:

| | | |
|---|---|---|
| Base offense level: | 7 | (USSG §§ 2S1.1(a)(1) and 2B1.1(a)(1)) |
| Loss (More than $550K): | +14 | (USSG § 2B1.1(b)(1)(H)) |
| Money Laundering: | +2 | (USSG § 2S1.1(b)(2)(B)) |
| Sophisticated Means: | +2 | (USSG §§ 2S1.1(b)(3) and 2B1.1(b)(10)) |
| Minor Role: | -3 | (USSG § 3B1.2) |
| Acceptance of Responsibility: | -2 | (USSG §§ 3E1.1(a)) |
| **Total Offense Level:** | **20** | |

4

(PSR ¶¶ 5, 33-43, 89-90.)[1,2] The government agrees with Probation's Guidelines calculations and its assessment that Defendant is a Category I offender (*id.* ¶¶ 46, 89), but submits that Defendant should receive a 3- rather than a 2-level adjustment for acceptance of responsibility because she entered a timely guilty plea. *See* USSG § 3E1.1(b). Assuming the Court agrees, Defendant's total offense level is 19 and her advisory Guidelines range is 30 to 37 months imprisonment, which is lower than the advisory Guidelines range the government and Defendant stipulated to in her plea agreement. (Dkt. 8 ¶ 4.)



---

[1] Probation found that Defendant was an "average" and not a minor participant in the scheme, but kept the minor role adjustment in its Guidelines calculations because the government stipulated to the adjustment in Defendant's plea agreement and, therefore, Probation deferred to the government's assessment of Defendant's role. (PSR ¶ 28.) In addition, Probation stated that it kept the minor role adjustment in Defendant's Guidelines calculations because Defendant was "being held accountable for the total loss amount of the conspiracy which includes funds disbursed to or received by other conspirators with whom she had no connection." (*Id.*) It should be noted that under USSG § 2B1.1, a defendant is held responsible for losses caused by their co-conspirators if those losses are reasonably foreseeable to the defendant. *See* USSG § 2B1.1, comment. (n.3). In Defendant's case, both the factual findings that Probation made in Defendant's PSR and Defendant's admissions in her Statement of the Offense show that she was well aware of the full scope of the conspiracy and that her brother and Med Star were not the only nominees and shell companies involved in the scheme – an assertion supported by Defendant's admission that she deposited checks from Hopiken Medical Service Int LLC into her personal bank account and then distributed proceeds from those deposits to her co-conspirators. (PSR ¶¶ 13-25, 28; Dkt. 7 ¶ 23.) Defendant also admitted in her plea agreement that she was responsible for the full loss that she and her co-conspirators caused the Health Office. (Dkt. 8 (Plea Agreement) ¶ 12.)

[2] Defendant admitted in her Statement of the Offense that "[f]rom in or around January 2014 until September 2014, more than $1.5 million in checks were issued by the Kuwait Health Office to the shell companies." (Dkt. 7 ¶ 27.) Because Defendant's admitted that she and her co-conspirators intended to defraud the Health Office of more than $1.5 million, Defendant was eligible for a 16- rather than a 14-level loss enhancement. *See* USSG § 2B1.1(b)(1)(I). As such, Defendant received the benefit of a lower advisory Guidelines range in both her plea agreement and PSR. (PSR ¶¶ 33-43, 89; Dkt. 8 ¶ 4.)



## IV.  SECTION 3553(a) FACTORS

### A.  The Nature of the Offense and Defendant's History and Characteristics

Title 18, United States Code, Section 3553(a) provides numerous factors for the Court to consider when determining Defendant's sentence.  For example, section 3553(a)(1) directs the Court to consider the nature and circumstances of Defendant's offense and her history and characteristics.

As the government discussed in Sedik's sentencing papers, Defendant and her co-conspirators' embezzlement scheme was serious, and resulted in the theft of over $1.3 million intended for Kuwaiti citizens whose medical conditions were dire enough to require them to travel from Kuwait to the United States for medical care.  (PSR ¶¶ 8-12.)  Like Al-Sharaf and Sedik, Defendant knew from her employment in the Health Office that its mission was to coordinate and pay for the medical care of sick Kuwaiti citizens, but Defendant chose to exploit her insider position, and the Health Office's weak internal controls, to steal money meant for sick people and use it to benefit herself and Osman.  (*Id.* ¶ 13-25.)

Defendant was greedy and knew early on that the Nominees stood to reap great financial benefit from the scheme. Defendant did not want her name associated with a shell company and, therefore, she helped Sedik recruit Osman to be a nominee of a shell company knowing that Osman could escape the United States if the scheme was exposed. (*Id.* ¶ 20.) Using her brother as a nominee allowed Defendant to function as a nominee while insulting herself from criminal expose. While Defendant's name was not on Med Star's bank account, Defendant made deposits into and withdrawals from the account, at one point transferring approximately $25,228 in embezzlement proceeds from Med Star's account to a BB&T Bank account that she and Osman owned. (*Id.* ¶¶ 21, 24.) However, by not associating her name with any of the shell companies, Defendant did not bear the same risk as Osman and other the Nominees, and could feign ignorance of and deny participation in the scheme if it was exposed.

Defendant's role in the scheme was not limited to helping Osman swindle money from the Health Office. Defendant worked hard to ensure that her co-conspirators succeeded in stealing money from the Health Office and concealing the scheme. Defendant coordinated the issuance of fraudulent invoices with Sedik and the Nominees, calling the Nominees and advising them of when it was time for them to submit new fraudulent invoices to the Health Office. (*Id.* ¶ 20.) Defendant also coordinated the retrieval and deposit of checks with Sedik and the Nominees, deposited checks into the shell companies' bank accounts, and deposited checks drawn off the shell companies' bank accounts into her personal bank account and then withdrew and distributed the proceeds to her co-conspirators. (*Id.* ¶¶ 20-22.)

Of course, Defendant placed a price on the aid that she provided to her co-conspirators. As compensation for her role in the scheme, Defendant received all or a portion of the proceeds that she obtained from depositing into her personal bank account and cashing checks issued by

the shell companies. (*Id.* ¶ 23.) She also shared control of a bank account into which she deposited approximately $25,228 of embezzlement proceeds – a sum approximately equal to nine months of her Health Office salary. (PSR ¶ 74; Dkt. 7 ¶ 26.)

When Defendant and her co-conspirators' scheme was exposed in September 2014, Defendant did not report it or do anything to mitigate the harm that she and her co-conspirators caused the Health Office. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Through it all, Defendant had no reason other than greed to participate in the scheme. Defendant has a college degree and speaks two languages. (PSR ¶¶ 67-69.) At the time Defendant chose to embezzle money from the Health Office, she made $2,800 a month as a data entry specialist and had been certified as a nursing assistant. (*Id.* ¶¶ 68-69, 74.) Rather than participate in this scheme, Defendant could have reported it to the Health Office or quit the Health Office and worked as a nursing assistant, as she is doing now. (*Id.* ¶¶ 75-76.) In fact, currently, Defendant earns approximately the same income as nursing assistant as she earned as a data entry specialist at the Health Office. (*Id.* ¶¶ 74, 75.) Defendant had other options available to support herself, but she chose to go for the easy money and defraud the Health Office of over $1.3 million.

Take as a whole, the nature and circumstances of Defendant's offense and her history and characteristics warrant a sentence of 33 months imprisonment.

    **B.**    **The Need for the Sentence Imposed to (i) Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the**

8

**Offense; (ii) Afford Adequate Deterrence; (iii) Protect the Public from Further Crimes of Defendant; and (iv) Provide Defendant with Appropriate Education or Vocational Training**

Section 3553(a)(2) requires the Court to consider a number of factors when fashioning Defendant's sentence, including the need for the sentence to reflect the seriousness of the offense, provide just punishment to Defendant, promote respect for the law, and deter other criminal conduct. The government's recommended sentence of 33 months imprisonment achieves all of the relevant section 3353(a)(2) factors.

If the Court grants Defendant a 3-level adjustment for acceptance of responsibility, her advisory Guidelines range is 30 to 37 months imprisonment. This Guidelines range takes into account the seriousness of Defendant's offense, and as the government pointed out in Sedik's sentence papers, courts are entitled to presume that a sentence within a properly calculated Guidelines range is reasonable and provides just punishment to the defendant. *See Rita v. United States*, 551 U.S. 338, 346 (2007) (agreeing that courts may afford presumption of reasonableness to within-Guidelines sentence). The government's recommended sentence of 33 months imprisonment is within a properly calculated advisory Guidelines for Defendant and, therefore, the Court can presume that imposition of a 33-month sentence of imprisonment is reasonable and satisfies the requirements of section 3553(a)(2). *See id.*

**C.  Kinds of Available Sentences**

Section 3553(a)(3) directs the Court to consider the kinds of sentences available for Defendant. In this case, the maximum term of imprisonment for Defendant's offense is twenty years, the greater of a $250,000 fine or twice the gain or loss from the crime, three years supervised release, and a $100 special assessment. (PSR ¶¶ 88, 93-94, 104-105.) The United States agrees with Probation that the Guidelines prohibit the Court from imposing a probationary

9

sentence. (*Id.* ¶ 101.) As such, the Court should impose a custodial sentence, and sentence Defendant to 33 months imprisonment.

### D.     The Sentencing Range Established by the Guidelines

In addition, section 3553(a)(4) directs the Court to consider Defendant's advisory Guidelines range. As discussed above, the government agrees with Probation's Guidelines calculations, but recommends that the Court grant Defendant a 3- rather than a 2-level adjustment for acceptance of responsibility. If the Court agrees with the government's recommendation, Defendant's total offense level is 19 and her advisory Guidelines range is 30 to 37 months imprisonment. ███████████████████████████████████████████████████████████████████████████████

The government submits that Defendant's presumed status as a deportable alien does not warrant a departure from an advisory Guidelines ranges of 30 to 37 months imprisonment. The concerns raised by the court in *United States v. Smith*, 27 F.3d 649, 651-656 & n. 2 (D.C. Cir. 1994) are not present here. (PSR ¶ 115.) Assuming Defendant is, in fact, a deportable alien, Defendant has family ties to the United States, has lived in the United States for more than five years, and has a stable history of employment. (*Id.* ¶¶ 51-55, 57-60, 72-76.) Therefore, to the extent the Bureau of Prisons policy discussed in *Smith* is still in place, Defendant will not suffer more severe conditions of confinement because if it. *See Smith*, 27 F.3d at 651 & n. 2.

In addition, as noted above, Defendant is also receiving the benefit of a Guidelines range that does not fully account for the $1.5 million in loss that she and her co-conspirators intended to cause the Health Office, and a includes a minor role reduction when Probation found Defendant to be an average participant in the scheme. (PSR ¶ 28; Dkt. 7 ¶ 27.) To reduce

Defendant's Guidelines range any more would undermine the section 3353(a) factors by imposing a sentence on Defendant that does not truly consider the seriousness of Defendant's offense or her role in it and certainly would not provide just punishment to Defendant.

### E. Pertinent Policy Statements and Need to Avoid Unwarranted Sentencing Disparities

Finally, sections 3553(a)(5) and (a)(6) require the Court to consider pertinent policy statements and the need to avoid unwarranted sentencing disparities when sentencing Defendant. Notwithstanding ███████████████ the potential variance identified by Probation in the PSR, the government concurs with Probation that there are not any atypical or other Guidelines or section 3553(a) factors that warrant a sentence outside of Defendant's advisory Guidelines range. (PSR ¶¶ 110-111.)

Moreover, a sentence of 33 months of imprisonment will not create unwarranted sentencing disparities among similarly situated defendants. The government recommended a 36 month sentence of imprisonment for Sedik, who played a more pronounced role in the scheme, but who did more than Defendant to mitigate the harm caused by his and Defendant's criminal conduct. While Defendant did not mastermind the scheme, she was instrumental its success. Defendant acted as an intermediary between Sedik and the Nominees, coordinating the receipt and delivery of fraudulent invoices and checks and laundering the embezzlement proceeds. Defendant and her family also profited from the scheme, with approximately $284,000 of embezzlement proceeds going into Med Star's account. And since the scheme was exposed, Defendant has done little to mitigate the harm she caused or help the government locate and capture Osman. A sentence of 33 months imprisonment is more than fair to punish Defendant for her criminal conduct and account her role in the scheme.

//

## V.   CONCLUSION

The government submits that the Court should sentence Defendant to 33 months imprisonment, three years supervised release, a $100 special assessment, and order Defendant to pay $1,381,016.05 in restitution payments to the State of Kuwait.

Date: March 4, 2019          Respectfully submitted,

DEBORAH CONNOR, CHIEF
MONEY LAUNDERING & ASSET RECOVERY SECTION

By:  _____
Jonathan T. Baum
Senior Trial Attorney
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice